[No. S037138. Jan. 29, 1996.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMAL K. SWAIN et al., Defendants and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan, Ann K. Jensen, Ronald E. Niver and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Appellant.

George L. Schraer, Richard Phillips and Charles M. Bonneau, under appointments by the Supreme Court, for Defendants and Appellants.

## OPINION

**BAXTER, J.**—Defendants Jamal K. Swain and David Chatman were each convicted of conspiracy to commit murder and other crimes, stemming from the drive-by shooting death of a 15-year-old boy. As we shall explain, we hold that intent to kill is a required element of the crime of conspiracy to commit murder. In light of the jury instructions given, and general verdicts returned, we cannot determine beyond a reasonable doubt whether the jury found that the defendants conspired with an intent to kill. That conclusion requires us to reverse defendants' conspiracy convictions.

### FACTS AND PROCEDURAL BACKGROUND

The question before us is one of law; the facts found by the Court of Appeal, summarized below, are not disputed.

Prosecution evidence established that a brown van passed through the Hunter's Point neighborhood of San Francisco about 2 a.m. on January 13, 1991. It slowed down near the spot where the young victim, who was of Samoan descent, and his friends were listening to music on the street.

A young Black male who appeared to have no hair was driving the van. Suddenly several shots were fired from the front of the van. Defendant Chatman and another young man also fired guns from the rear of the van. One of the intended victims had yelled out "drive-by" as a warning of the impending shooting, so most of the people on the street ducked down. The 15-year-old victim, Hagbom Saileele, who was holding the radio from which music was playing, was shot twice from behind. He later died in surgery.

Afterward, defendant Swain was in jail and boasted to jailmates about what good aim he had with a gun: "He was talking about what a good shot he was. [¶] . . . [¶] He was saying he had shot that Samoan kid when they were in the van going about 30 miles an hour up a hill." The area where the shooting occurred is hilly; the van would have had to have been traveling uphill as it passed by the scene of the shooting.

Evidence also established that defendant Swain had used his jailhouse visiting privileges to threaten and intimidate witnesses into changing their stories, so that he would not be identified as involved in the crime.

The abandoned brown van was recovered by police; in the van and nearby were found surgical gloves, expended cartridges, a hooded ski mask, and two handguns—a .380-caliber semiautomatic and a .25-caliber automatic. Defendant Swain's fingerprint was on the inside of the driver's side window. The forensic evidence established that whoever had used the .380-caliber semiautomatic handgun, from which the fatal shots were fired, had been sitting in the driver's side front seat of the van.

The .380-caliber gun was traced, through a series of owners and transactions involving narcotics, to defendant Chatman. Chatman was interrogated by police; he denied any knowledge of the van and claimed he had not purchased the gun. When this story proved false, Chatman admitted he had bought the gun, but claimed it had been stolen from him. Still later, he claimed he had sold it to someone else.

A warrant was obtained for Chatman's arrest. After waiving his rights, Chatman told police he and two other people, not including Swain, had driven the van to the crime scene in order to get revenge for a car theft by a rival gang. Chatman insisted, to the police and at trial, that Swain had not

been in the van. He could not, however, explain Swain's fingerprint inside the van.

The owner of the van testified Swain had never been inside his van prior to the incident, but that Swain had intimidated him into telling police he (Swain) had previously been inside the vehicle, since otherwise "he was going to have something done to him."

At trial, Chatman admitted he had been in the van, which was driven to Hunter's Point to retaliate for a car theft attributed to a neighborhood youth who was not the victim of the shooting. The original plan was allegedly to steal the car of the thief. Chatman admitted he had fired shots, but claimed he fired wildly and only in self-defense. In support of this self-defense theory, he testified he heard an initial shot and thought it was fired by someone outside the van shooting at him, so he returned the fire. As noted, Chatman claimed Swain was not in the van.

Swain testified he was not in the van during the shooting and did not do any shooting. He claimed he had entered the van earlier in the evening, but had left because "the smell of marijuana bothered him." He claimed he took BART (Bay Area Rapid Transit) to Berkeley, where he spent the evening at a relative's home. He denied boasting about shooting the victim and denied having threatened any witnesses.

The jury first returned a verdict finding defendant Chatman guilty of second degree murder and conspiracy. As instructed, the jury also made a finding that the target offense of the conspiracy was murder in the second degree. Several days later, the jury returned verdicts against defendant Swain, finding him not guilty of murder or its lesser included offenses, but guilty of conspiracy and of attempting to dissuade a witness from testifying by threats. Once again, the jury made a finding under the conspiracy count that the target offense of the conspiracy was murder in the second degree.

At the sentencing hearing, the parties disputed the proper sentence for the crime of conspiracy to commit murder, where the target offense is found by the jury to be murder in the second degree. The trial court ultimately ruled that the proper sentence was an indeterminate term of 15 years to life, that prescribed for murder in the second degree, not 25 years to life, that prescribed for murder in the first degree, as the People had argued.

Chatman was sentenced to 15 years to life for second degree murder, with a consecutive 4-year enhancement for personal firearm use. A sentence of 15 years to life for the conspiracy count was imposed but stayed pursuant to Penal Code section 654.

Swain was sentenced to 15 years to life for conspiracy, and an additional 3 years for the conviction of attempting to dissuade a witness from testifying by threats.

Both defendants appealed on several grounds, including the question of whether intent to kill is a required element of the crime of conspiracy to commit murder. More particularly, where, as here, the target offense is determined to be murder *in the second degree*, does conviction of conspiracy to commit murder necessarily require proof of express malice—the functional equivalent of intent to kill—or can one conspire to commit implied malice murder? The People also appealed, contending the trial court improperly sentenced defendants to indeterminate terms of 15 years to life on the conspiracy counts because, assertedly under Penal Code section 182, every "conspiracy to commit murder" must be punished as a first degree murder, with a sentence of 25 years to life. The Court of Appeal affirmed the convictions and judgments imposing sentence in their entirety.

Defendants and the People each petitioned for review. We granted the petitions, limiting review to two issues: (1) is intent to kill a required element of conspiracy to commit murder, and (2) what is the punishment for conspiracy to commit murder, given the prescripts of Penal Code section 182?

DISCUSSION

I

Defendants contend the jury should have been instructed that proof of intent to kill is required to support a conviction of conspiracy to commit murder, whether the target offense of the conspiracy—murder—is determined to be in the first or second degree. More particularly, defendants assert it was error to instruct the jury on the principles of *implied malice* second degree murder in connection with the determination of whether they could be found guilty of conspiracy to commit murder, since *implied malice* does not require a finding of intent to kill. As we shall explain, we agree.

We commence our analysis with a brief review of the elements of the crime of conspiracy, and of murder, the target offense of the conspiracy here in issue.

Conspiracy is an inchoate crime. (See *United States* v. *Feola* (1975) 420 U.S. 671, 694 [43 L.Ed.2d 541, 558, 95 S.Ct. 1255].) It does not require the commission of the substantive offense that is the object of the conspiracy. (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 47 [139 Cal.Rptr. 275].)

"As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime," and "thus reaches further back into preparatory conduct than attempt . . . ." (Model Pen. Code & Commentaries (1985) com. 1 to § 5.03, pp. 387-388.)

The crime of conspiracy is defined in the Penal Code as "two or more persons conspir[ing]" "[t]o commit any crime," together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance thereof. (Pen. Code, §§ 182, subd. (a)(1), 184.) ■ "Conspiracy is a 'specific intent' crime. . . . The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree *but also that they intended to commit the elements of that offense.*" (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300] (*Horn*), citations omitted, italics added.) In some instances, the object of the conspiracy "is defined in terms of proscribed conduct." (Model Pen. Code & Commentaries, *supra*, com. 2(c) to § 5.03, p. 402.) ■■ In other instances, it "is defined in terms of . . . a proscribed result under specified attendant circumstances." (*Ibid.*)[1]

Another provision of the Penal Code, section 182, the current version of which was enacted in 1955, prescribes the punishment for the crime of conspiracy. "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree."

■ Turning next to the elements of the target offense of the conspiracy here in issue, Penal Code section 187 defines the crime of murder as the "unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) Malice aforethought "may be express or implied." (Pen. Code, § 188.) "It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*)

---

[1] As Witkin summarizes it: "[t]he elements [of conspiracy] are (a) agreement . . . ; (b) specific intent . . . ; (c) two or more persons . . . ; (d) unlawful object or means . . . ; and (e) overt act. . . ." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 156, p. 174.)

This court has observed that proof of unlawful "intent to kill" is the functional equivalent of express malice. (See *People* v. *Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588] ["Pursuant to the language of [Penal Code] section 188, when an intentional killing is shown, malice aforethought is established."].)[2]

Penal Code section 189 distinguishes between murders in the first degree and murders in the second degree. "All murder which is perpetrated by means of a destructive device or explosive . . . , poison, lying in wait, torture, *or by any other kind of willful, deliberate, and premeditated killing*, or which is committed in the perpetration of, or attempt to perpetrate, [certain enumerated felonies], or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is *murder of the first degree*. All other kinds of murders are of the second degree." (Italics added.)[3]

■ California law, in turn, recognizes three theories of *second degree* murder.

The first is unpremeditated murder with express malice. (See CALJIC No. 8.30 ["Murder of the second degree is [also] the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation."].)

The second, of particular concern here, is implied malice murder. (See CALJIC No. 8.31 ["Murder of the second degree is [also] the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."].)

The third theory is second degree felony murder. (See CALJIC No. 8.32 ["The unlawful killing of a human being, whether intentional, unintentional

[2]Of course unreasonable self-defense or a heat of passion defense can further reduce an intentional killing to voluntary manslaughter.

[3]The provision of Penal Code section 189, making all murders "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death" murders of the first degree, was added after commission of the crimes in this case (see Stats. 1993, ch. 611, § 4.5, eff. Oct. 1, 1993, operative Jan. 1, 1994) and thus does not apply herein.

or accidental, which occurs [during] [as the direct causal result of] the commission or attempted commission of [certain crimes] is murder of the second degree when the perpetrator had the specific intent to commit such crime."] [Third bracket added].)

As noted, the jury in this case was instructed on the elements of murder, including principles of *implied malice* second degree murder. Under the instructions given, the jury could have based its verdicts finding defendants guilty of conspiracy to commit murder in the second degree on a theory of implied malice murder. The Court of Appeal below concluded it could find no authority supportive of the proposition that the crime of conspiracy to commit murder in the second degree must be accompanied by an intent to kill (i.e., express malice). Instead, the court relied on the holding in *People v. Alexander* (1983) 140 Cal.App.3d 647 [189 Cal.Rptr. 906] (*Alexander*), which case suggested that implied malice is "the most logical route" to establishing the crime of "conspiracy to commit murder in the second degree." (*Id.* at p. 665.) *Alexander*, in turn, purported to place principal reliance on this court's opinion in *Horn, supra*, 12 Cal.3d 290, interpreting *Horn* as holding that conspiracy to commit murder in the second degree can be based on a theory of implied malice murder.

As will be explained, *Horn, supra*, 12 Cal.3d 290, did not so hold. Nor do we find the rationale of *Alexander, supra*, 140 Cal.App.3d 647, otherwise sound in reasoning or result to the extent it concluded conspiracy to murder can be grounded on implied malice murder. Before turning to those cases, some preliminary observations will shed light on the logical answer to the question at hand.

We have noted that conspiracy is a specific intent crime requiring an intent to agree or conspire, and a further intent to commit the target crime, here murder, the object of the conspiracy. Since murder committed with intent to kill is the functional equivalent of *express malice* murder, conceptually speaking, no conflict arises between the specific intent element of conspiracy and the specific intent requirement for such category of murders. Simply put, where the conspirators agree or conspire with specific intent to kill and commit an overt act in furtherance of such agreement, they are guilty of conspiracy to commit express malice murder. The conceptual difficulty arises when the target offense of murder is founded on a theory of implied malice, which requires no intent to kill.

*Implied malice* murder, in contrast to express malice, requires instead an intent to do some act, the natural consequences of which are dangerous to human life. "*When the killing is the direct result of such an act,*" the requisite

mental state for murder—malice aforethought—is implied. (CALJIC No. 8.31, italics added.) In such circumstances, ". . . it is not necessary to establish that the defendant intended that his act would result in the death of a human being." (*Ibid.*) Hence, under an *implied malice* theory of second degree murder, the requisite mental state for murder—malice aforethought —is by definition "implied," as a matter of law, from the specific intent to do some act dangerous to human life *together with the circumstance that a killing has resulted from the doing of such act.*

Stated otherwise, all murders require, at the core of the corpus delicti of the offense, a "killing." (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Ives* (1941) 17 Cal.2d 459, 463 [110 P.2d 408]; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements of Crime, § 136, p. 152; 1 Wharton's Criminal Law (15th ed. 1993) § 28, p. 172.) "Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) But only in the case of *implied malice* murder is the requisite mental state—malice aforethought—implied from the specific intent to do some act *other than* an intentional killing *and* the resulting circumstance: a killing that has in fact occurred as "the direct result of such an act." (CALJIC No. 8.31.)

The element of malice aforethought in implied malice murder cases is therefore derived or "implied," in part through hindsight so to speak, from (i) proof of the specific intent to do some act dangerous to human life *and* (ii) the circumstance that a killing has resulted therefrom.     It is precisely due to this nature of *implied malice* murder that it would be *illogical* to conclude one can be found guilty of conspiring to commit murder where the requisite element of malice is implied. Such a construction would be at odds with the very nature of the crime of conspiracy—an "inchoate" crime that "fixes the point of legal intervention at [the time of] agreement to commit a crime," and indeed "reaches further back into preparatory conduct than [the crime of] attempt" (Model Pen. Code & Commentaries, *supra*, com. 1 to § 5.03, pp. 387-388)—precisely because commission of the crime could never be established, or be deemed complete, unless and until a killing actually occurred.

By analogy, we have reached similar conclusions respecting the nature of proof of the element of malice required to establish the inchoate crimes of assault with intent to commit murder and attempted murder.

In *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446] (*Murtishaw*), the defendant was convicted of three counts of first degree murder and one count of assault with intent to commit murder, in violation

of former Penal Code section 217. (29 Cal.3d at p. 762.)[4] The jury was instructed that the crime required proof of specific intent to commit murder, but was further instructed that murder can be based on express malice, implied malice, or felony murder. However, the jury was also instructed that for intent to commit murder, the necessary specific intent "is to unlawfully kill." (*Id.* at p. 763.) This court found such instructions, taken as a whole, were contradictory in that they defined the requisite mental element of the offense in two different ways—intent to kill and intent to murder—and by implication defined the latter to include theories of murder not requiring intent to kill, i.e., implied malice murder and felony murder. (*Ibid.*; accord, *People* v. *Coleman* (1989) 48 Cal.3d 112, 137-138 [255 Cal.Rptr. 813, 768 P.2d 32]; *People* v. *Johnson* (1981) 30 Cal.3d 444, 447-449 [179 Cal.Rptr. 209, 637 P.2d 676].)

We went on in *Murtishaw, supra,* 29 Cal.3d 733, to observe that "[e]stablished California authority . . . demonstrates that the concept of implied malice, insofar as it permits a conviction without proof of intent to kill, is . . . inapplicable to the assault [with intent to commit murder] charge." (*Id.* at p. 764.) We then explained: "In *People* v. *Mize* (1889) 80 Cal. 41 [22 P. 80], the court instructed the jury that defendant would be guilty of assault with intent to commit murder if his acts were such that he could have been convicted of murder had the victim died. The court held the instruction erroneous: ' "To constitute murder, the guilty person need not intend to take life; but to constitute an attempt to murder, he must so intend." [Citation.] "The wrongdoer must specifically contemplate taking life; and though his act is such as, were it successful, would be murder, if in truth he does not mean to kill, he does not become guilty of an attempt to commit murder." ' (80 Cal. at p. 43.) (Accord, *People* v. *Miller* (1935) 2 Cal.2d 527, 532-533 [42 P.2d 308, 98 A.L.R. 913].)" (*Murtishaw, supra,* 29 Cal.3d at p. 764.) We further noted that ". . . once a defendant intends to kill, any malice he may harbor is necessarily express malice. Implied malice . . . cannot coexist with a specific intent to kill. To instruct on implied malice in that setting, therefore, may confuse the jury by suggesting that they can convict without finding a specific intent to kill." (*Id.* at pp. 764-765, fn. omitted.)

Similarly, in *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534] (*Collie*), we applied the above noted reasoning of *Murtishaw, supra,* 29 Cal.3d 733, to the crime of attempted murder. ■ To constitute an attempt, there must be (i) proof of specific intent to commit the target crime and (ii) a direct, ineffectual act done towards its commission. (1 Witkin & Epstein, Cal. Criminal Law, *supra,* Elements of Crime, § 143, p.

[4]Penal Code section 217 was repealed in 1981 for reasons not relevant here. (See *Murtishaw, supra,* 29 Cal.3d at pp. 762-763, fn. 24.)

160.) Concluding in *Collie* that the trial court erred in instructing the jury it could convict the defendant of attempted murder on the basis of implied malice and without a finding of intent to kill, we explained: " 'Specific intent to kill is a necessary element of attempted murder. It must be proved, and it cannot be inferred merely from the commission of another dangerous crime.' [Citation.]" (*Collie, supra*, 30 Cal.3d at p. 62; accord, *People* v. *Visciotti* (1992) 2 Cal.4th 1, 58-59 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Lee* (1987) 43 Cal.3d 666, 670 [238 Cal.Rptr. 406, 738 P.2d 752]; *People* v. *Ratliff* (1986) 41 Cal.3d 675, 695-696 [224 Cal.Rptr. 705, 715 P.2d 665].)

Finally, in *People* v. *Bottger* (1983) 142 Cal.App.3d 974 [191 Cal.Rptr. 408], the court applied reasoning similar to that employed by this court in *Murtishaw, supra*, 29 Cal.3d 733, and *Collie, supra*, 30 Cal.3d 43, to yet a third inchoate crime related to murder—solicitation to commit murder. Solicitation is complete upon the making of the request or proposal, even when the person solicited immediately rejects it. (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements of Crime, § 124, p. 143.) Unlike conspiracy, proof of solicitation requires neither agreement nor commission of an overt act. (*Ibid.*) Unlike attempt, it requires no direct, unequivocal act toward the commission of the target offense. (*Id.*, § 143, p. 160.) The *Bottger* court held that, as with assault with intent to commit murder and attempted murder, solicitation for murder requires intent to kill and cannot be based on a theory of implied malice. (*People* v. *Bottger, supra*, 142 Cal.App.3d at pp. 980-982; see also *People* v. *Phillips* (1985) 41 Cal.3d 29, 77 [222 Cal.Rptr. 127, 711 P.2d 423] [citing *Bottger* with approval for the proposition that solicitation for murder requires specific intent to kill].)

As noted, the opinion in *Alexander, supra*, 140 Cal.App.3d 647, on which the Court of Appeal relied in the present case, concluded conspiracy to commit murder can be based on a theory of implied malice murder. (*Id.* at p. 665.) The *Alexander* court took note of the holdings in *Murtishaw, supra*, 29 Cal.3d 733, and *Collie, supra*, 30 Cal.3d 43, but found them inapposite in the context of establishing malice for conspiracy to commit murder, apparently believing that to do so would run afoul of this court's holding in *Horn, supra*, 12 Cal.3d 290. (*Alexander, supra*, 140 Cal.3d at pp. 665-666.) In this regard the *Alexander* court erred. We turn, next, to our decision in *Horn*.

The defendants in *Horn, supra*, 12 Cal.3d 290, were convicted of conspiracy to commit murder in the first degree, arson, and the unlawful manufacture of a firebomb. At trial the defendants presented evidence suggesting that at the time of the conspiracy they were so intoxicated they lacked the capacity to harbor malice aforethought, thus making their unlawful agreement, at most, a conspiracy to commit voluntary manslaughter. (*Id.* at p.

293.) The trial court, however, refused to instruct the jury that diminished capacity arising from voluntary intoxication could reduce a homicide to manslaughter, thus leaving the jury with an all-or-nothing choice on the conspiracy to commit murder count. The *Horn* court concluded such refusal to instruct on conspiracy to commit manslaughter required reversal of the conspiracy to commit murder counts.

The court in *Horn* recognized that earlier, in *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794] (*Kynette*), we had stated that ". . . 'a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree for the obvious reason that the agreement to murder necessarily involves the "willful, deliberate and premeditated" intention to kill a human being.' " (*Horn, supra*, 12 Cal.3d at p. 298, quoting *Kynette, supra*, 15 Cal.2d at p. 745.) This was so because, at the time *Kynette* was decided, premeditation meant merely "advance planning of the crime." (*Horn, supra*, 12 Cal.3d at p. 298.)

As of the time *Horn, supra*, 12 Cal.3d 290, was decided, however, later cases had redefined premeditation as "requir[ing] proof that the defendant 'could maturely and meaningfully reflect upon the gravity of his contemplated act.' [Citations.]" (*Id.* at p. 298.) Furthermore, although a conviction of murder or conspiracy to commit murder in any degree requires proof of malice aforethought, cases postdating *Kynette, supra*, 15 Cal.2d 731, had held that malice could be rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication, i.e., recognition of the "diminished capacity defense." (See *People* v. *Graham* (1969) 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Gorshen* (1959) 51 Cal.2d 716, 727 [336 P.2d 492]; *Horn, supra*, 12 Cal.3d at p. 299.)

The *Horn* court looked to these changes in the law postdating *Kynette, supra*, 15 Cal.2d 731, considered the evidence of Horn's diminished capacity caused by intoxication, noted the absence of any basis on which to conclude that the jury, as instructed, had rejected such evidence in convicting Horn and his codefendant of conspiracy to commit murder, and concluded it was therefore reversible error to fail to instruct on the lesser offense of conspiracy to commit manslaughter. (*Horn, supra*, 12 Cal.3d at pp. 300-301.)

More pertinent to our present analysis, nothing in the court's decision in *Horn* suggests that conspiracy to commit murder can be committed without intent to kill (express malice). Indeed, looking to the precise facts of that case, because the conspiracy to murder in *Horn* involved a firebomb and because, under Penal Code section 189 as then worded, "[a]ll murder which

is perpetrated by means of a bomb . . . is murder in the first degree," verdicts of conspiracy to commit murder in the second degree in *Horn* would have been contrary to law, and the *Horn* court so recognized. (*Horn, supra,* 12 Cal.3d at pp. 299-300.) In short, neither the facts of *Horn,* its rationale, nor its holding mandates the view that conspiracy to commit murder can be based on a theory of implied malice.

We conclude that a conviction of conspiracy to commit murder requires a finding of intent to kill, and cannot be based on a theory of implied malice.

## II

The question remains whether the instructions on implied malice in this case were prejudicial, requiring reversal of defendants' convictions of conspiracy to commit murder designated by the jury as murder in the second degree. We conclude the convictions must be reversed.

The jury was instructed on theories of both express and implied malice. They returned general verdicts, which do not inform us on what theory they found the requisite element of malice necessary to convict on the charges of conspiracy to commit murder. Under the implied malice instructions, the jury could have found malice without finding intent to kill. (Pen. Code, § 188.) The prosecutor repeatedly referred to implied malice in the closing arguments, stating at one point that ". . . this could very easily be an implied malice case."

On this record, under the harmless error test traditionally applied to misinstruction on the elements of an offense, namely, whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see *People* v. *Harris* (1994) 9 Cal.4th 407, 424-425 [37 Cal.Rptr.2d 200, 886 P.2d 1193], and cases cited), reversal is required, for it cannot be determined beyond a reasonable doubt that the erroneous implied malice murder instructions did not contribute to the convictions on the conspiracy counts. Nor is there anything else discoverable from the verdicts that would enable us to conclude that the jury necessarily found the defendants guilty of conspiracy to commit murder on a proper theory, i.e., based on express malice or intent to kill. (*People* v. *Harris, supra,* 9 Cal.4th at p. 419.) Defendant Chatman was convicted of second degree murder, which conviction itself could have been based on a theory of implied malice; defendant Swain was found not guilty of murder and its lesser offenses.

That portion of the Court of Appeal's judgment affirming defendants' convictions of conspiracy to commit murder must therefore be reversed.

## III

We are mindful that conceptually difficult questions remain regarding whether there exists a viable offense of conspiracy to commit express malice "second degree" murder, and if there be such an offense, what is the applicable punishment. The question also remains whether defendants in this case may be retried for conspiracy to commit murder in the first degree given the jury's determination that they conspired to commit murder and its further designation of that murder as having been in the second degree.

Confusion has arisen in the wake of several key changes to the law of murder and, in particular, to the definition of premeditation, all of which postdated *Horn, supra,* 12 Cal.3d 290, and which have called into question the continued validity of certain aspects of that opinion's holding.

First, the characterization of premeditation upon which *Horn, supra,* 12 Cal.3d 290, relied, namely, a showing that the defendant was able to " '*maturely and meaningfully reflect upon the gravity of his contemplated act*' " (*Horn, supra,* 12 Cal.3d at p. 298, italics added, quoting *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]), has itself passed into history. Seven years after *Horn* was decided, the Legislature amended Penal Code section 189 to provide that "To prove the killing was 'deliberate and premeditated,' *it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act.*" (Stats. 1981, ch. 404, § 7, p. 1593, italics added.)

Second, since *Horn, supra,* 12 Cal.3d 290, was decided, the Legislature has abolished the defense of diminished capacity. (See Stats. 1981, ch. 404, § 4, p. 1592 [enacting Pen. Code, § 28].) As one court has observed: "*Horn,* decided in 1974, was premised largely on the continued existence of the diminished capacity defense. In light of the subsequent legislative abrogation of that defense, we question the continued validity of *Horn* and *Alexander* [*supra,* 140 Cal.App.3d 647]." (*People* v. *Miller* (1992) 6 Cal.App.4th 873, 878, fn. 2 [8 Cal.Rptr.2d 193].)

It can be argued that the current statutory definition of premeditation is once again akin to the definition of premeditation in effect when this court decided *Kynette, supra,* 15 Cal.2d 731, namely, mere "advanced planning of the crime." Thus, the rationale of *Horn, supra,* 12 Cal.3d 290, would no longer afford any principled basis on which to distinguish between the mental state required for *conspiracy* to commit murder; the specific intent to agree and conspire with intent to kill—and the mental state of *premeditated* first degree murder. Stated differently, conspiring to murder with the requisite intent to kill is arguably functionally indistinguishable from the mental

state of premeditating the target offense of murder. If that be the case, then logically, all conspiracy to commit murder is necessarily "conspiracy to commit first degree murder," or perhaps more accurately stated, conspiracy to commit murder *punishable* as first degree murder under the provisions of Penal Code section 182.

The arguably ambiguous provisions of Penal Code section 182, which, by their express terms, purport only to prescribe the proper *punishment* for conspiracy convictions, but which were construed in *Horn, supra,* 12 Cal.3d 290, 298, footnote 5, as creating or authorizing conviction of the offense of "conspiracy to commit second degree murder," have further compounded the confusion. The controversial footnote in *Horn* states: *"Kynette's* assertion that a conspiracy to commit murder is always a conspiracy to commit first degree murder is inconsistent with the present language of Penal Code section 182. When *Kynette* was decided, section 182 provided simply that conspirators to commit a felony 'shall be punishable in the same manner and to the same extent as provided for the punishment of the commission of the said felony.' The current section 182, enacted in 1955, is much more specific: 'If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, *except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.*' [¶] As this language is written and punctuated, it plainly authorizes the trier of fact to return a verdict finding conspiracy to commit murder in the second degree. *Only* if the trier of fact fails to determine the degree is a conspiracy to commit murder punished as one to commit first degree murder. Since the Legislature has authorized a verdict of conspiracy to commit second degree murder, it clearly does not believe that crime to be a logical impossibility." (*Horn, supra,* 12 Cal.3d at p. 298, fn. 5, first italics added; second italics in original.)

The point made in the *Horn* footnote might be refuted by concluding that the portion of Penal Code section 182 quoted in italics above was added by the Legislature for the very purpose of effectuating this court's holding in *Kynette, supra,* 15 Cal.2d 731, that is to say, by expressly providing that all conspiracy to commit murder is conspiracy to commit murder *in the first degree,* and that hence all such conspiracies should be punished as first degree murders, with no consequent requirement that the jury further determine the degree of the target offense of murder. The *Horn* court's contrary interpretation—that "[*o*]*nly* if the trier of fact fails to determine the degree is

a conspiracy to commit murder punished as one to commit first degree murder . . ." (*Horn, supra,* 12 Cal.3d at p. 298, fn. 5)—does seem at odds with the general proposition, embodied in Penal Code section 182, that a defendant should receive the benefit of a jury's failure to designate the degree of the target offense of the conspiracy.

On the other hand, the relevant language of Penal Code section 182 quoted above, as suggested by the court in *Horn, supra,* 12 Cal.3d at page 298, footnote. 5, can literally be read as contemplating verdicts of "conspiracy to commit second degree murder." Nor would such a verdict necessarily be inconsistent with the holding we reach today, for one can be found guilty of *unpremeditated* murder with express malice in the second degree. (See CALJIC No. 8.30.)

The plain fact remains, however, that the analysis suggested in footnote 5 in *Horn, supra,* 12 Cal.3d at page 298, was dictum. As already explained, under the particular facts of that case, had the jury returned verdicts convicting Horn and his codefendant of "conspiracy to commit second degree murder," such verdicts would have been contrary to law as the defendants' plan to use a "bomb" elevated the target offense to murder in the first degree as a matter of law. Furthermore, the provisions of Penal Code section 182 are expressly addressed to the proper *punishment* for conspiracy, including conspiracy to commit murder. Punishment was simply not at issue in *Horn, supra,* 12 Cal.3d 290. ▮ " 'It is the general rule that the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 734-735 [257 Cal.Rptr. 708, 771 P.2d 406], quoting *River Farms Co.* v. *Superior Court* (1933) 131 Cal.App. 365, 369 [21 P.2d 643]; accord, *Security Pacific National Bank* v. *Wozab* (1990) 51 Cal.3d 991, 1003-1004 [275 Cal.Rptr. 201, 800 P.2d 557].)

Perhaps the lesson bears repeating here. We have determined that defendants' convictions for conspiracy to commit murder in the second degree must be reversed. The issue of proper punishment for those convictions is therefore no longer in controversy before us and is moot. Moreover, in light of our determination that reversal of the conspiracy convictions is compelled, the question of former jeopardy, or any other question regarding further proceedings, is premature unless and until the People elect to pursue such further proceedings and, in particular, seek to retry defendants on the theory of conspiracy to commit first degree murder. (See *People* v. *McDonald* (1984) 37 Cal.3d 351, 383-384, fn. 31 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) We therefore leave the determination of those questions for another day.

CONCLUSION

To the extent the judgment of the Court of Appeal affirmed defendants' convictions of conspiracy to commit murder, it is reversed. In all other respects the judgment of the Court of Appeal is affirmed.

Lucas, C. J., George, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment.

In this cause, we are presented with important questions concerning the crime of conspiracy to commit murder and the punishment prescribed therefor. I offer the following answers.[1]

## I. *The Legal Framework*

Let us begin by setting out the legal framework.

The first step concerns the crime of conspiracy. Penal Code section 182 expressly defines the crime of conspiracy to include the situation wherein "two or more persons conspire" "[t]o commit any crime." (*Id.*, subd. (a)(1).) Penal Code section 184 impliedly defines a conspiracy to commit a crime as an agreement "to effect [its] object." It also requires that an overt act, "beside such agreement, be done within this state . . . ." (*Ibid.*) For some crimes, the object "is defined in terms of proscribed conduct . . . ." (Model Pen. Code & Commentaries (1985) com. 2(c) to § 5.03, p. 402.) For others, it "is defined in terms of . . . a proscribed result under specified attendant circumstances . . . ." (*Ibid.*)

The second step relates to the crime of murder. Penal Code section 187 defines the crime of murder as the "unlawful killing of a human being, or a

---

[1]In the course of my analysis, I go beyond that of the majority. I do so in order to provide guidance as to issues, including double jeopardy, that are likely to arise on remand. We have often followed this path. (E.g., *People* v. *Wilson* (1992) 3 Cal.4th 926, 930, 937-943 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Marks* (1988) 45 Cal.3d 1335, 1338, 1344-1347 [248 Cal.Rptr. 874, 756 P.2d 260]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 167-188 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn. by Richardson, J.); see Code Civ. Proc., § 43 [providing that, "[i]n giving its decision, if a new trial be granted, the [appellate] court shall pass upon and determine all the questions of law involved in the case, presented upon . . . appeal, and necessary to the final determination of the case"].) I will not deviate in this instance. The issues in question are fully ripe for decision. They should not be passed over and allowed to cause mischief. Not long ago, in another cause, we pretermitted a double jeopardy issue (see *People* v. *Marks, supra,* 45 Cal.3d at p. 1344), only to produce three years of unnecessary litigation in the superior court, the Court of Appeal, and this court (see *People* v. *Superior Court (Marks)* (1991) 1 Cal.4th 56, 62-63 [2 Cal.Rptr.2d 389, 820 P.2d 613]). I will not take the same approach, and allow the same result, in this matter.

fetus, with malice aforethought." (*Id.*, subd. (a).) Penal Code section 188, in turn, provides that malice aforethought "may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."[2] Penal Code section 189 declares that all murder that is (1) "perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing," (2) "committed in the perpetration of, or attempt to perpetrate," certain enumerated felonies, or (3) "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death," is "murder of the first degree. All other kinds of murders are of the second degree."[3]

The third step proceeds from the first and second, and involves the crime of conspiracy to commit murder. Read together, Penal Code sections 182, 184, 187, 188, and 189 define the crime of conspiracy to commit murder— the object of which "is defined in terms of . . . a proscribed result under specified attendant circumstances" (Model Pen. Code & Commentaries, *supra*, com. 2(c) to § 5.03, p. 402)—as the agreement by two or more persons, accompanied by an overt act, to effect a killing that is unlawful under the circumstances as they are believed to be and that is reflective of malice aforethought (see *id.*, com. 2 to § 5.03, p. 394 [stating that "the actor's liability is measured from the situation as he views it"]). So defined, the crime of conspiracy to commit murder requires two kinds of "intent" strictly so called. One is intent to join together in a common endeavor: else,

---

[2] It is evident that the mental state required for the crime of murder is malice aforethought. Intent to kill is not *necessary* for malice aforethought. Penal Code section 188, which is quoted in the text, demonstrates the point. It is satisfied by the presence of an "abandoned and malignant heart" or the absence of "considerable provocation." Furthermore, intent to kill is not *sufficient* for malice aforethought. Penal Code 188 demonstrates this point as well. It also requires "unlawful[ness]." (*In re Christian S.* (1994) 7 Cal.4th 768, 778 [30 Cal.Rptr.2d 33, 872 P.2d 574], italics omitted; see Pen. Code, § 196 [providing that homicide by a public officer may be justifiable under certain circumstances, even if the officer acted with intent to kill]; *id.*, § 197 [same for homicide by any person].)

[3] It is evident that the mental state required for the crime of murder *of the first degree* does not entail intent to kill. Penal Code section 189, which is quoted in the text, demonstrates the point. It incorporates the common law doctrine of first degree felony murder, under which intent to kill is immaterial. It is also evident that the mental state required for the crime of murder *of the second degree* does not entail intent to kill. The requisite mental state is malice aforethought—for which intent to kill is neither necessary nor sufficient. (See fn. 2, *ante*.)

The declaration in Penal Code section 189, that all murder that is "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death," is "murder of the first degree," was added after the occurrence of the events with which we are concerned in this cause (Stats. 1993, ch. 611, § 4.5, eff. Oct. 1, 1993, operative Jan. 1, 1994), and hence is not applicable thereto.

there is no *conspiracy* to commit murder. The other is intent to kill unlawfully: else, there is no conspiracy to commit *murder*.[4] The offense does not require, as a factual matter, a *premeditated and deliberate* intent to kill unlawfully. But an intent of such character is present in the context of a conspiracy, practically by definition, because it does not arise of a sudden within a single person but is necessarily formed and then shared by at least two persons. (Cf. *People* v. *Ruiz* (1988) 44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854] [concluding that murder by lying in wait is, by definition, a kind of "willful, deliberate, and premeditated killing" within the meaning of Penal Code section 189, and does not require as a factual matter a premeditated and deliberate intent to kill unlawfully or even a simple intent to kill unlawfully].)

## II.   *Kynette and Horn*

Absent from the legal framework set out above are the two decisions that generate the conflict that we must here resolve concerning the crime of conspiracy to commit murder and the punishment prescribed therefor: *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794] (hereafter sometimes *Kynette*), overruled on another point in *People* v. *Snyder* (1958) 50 Cal.2d 190, 197 [324 P.2d 1], and *People* v. *Horn* (1974) 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300] (hereafter sometimes *Horn*).

In *Kynette*, we expressly held that "a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree for the obvious reason that the agreement to murder necessarily involves the 'willful, deliberate and premeditated' intention to kill a human being." (*People* v. *Kynette*, *supra*, 15 Cal.2d at p. 745.) Inasmuch as it encompasses malice aforethought, in fact *express* malice aforethought, such an "intention" distinguishes murder from other homicide. Also, by its very terms, it differentiates murder of the first degree in one of its forms from murder of the second degree.

In *Kynette*, we thereby impliedly held that the crime of conspiracy to commit murder is properly conspiracy to commit murder *simpliciter*. Under its reasoning, it is erroneous to speak of a "crime" of "conspiracy to commit

---

[4]See Model Penal Code and Commentaries, *supra*, comment 1 to section 5.03, pages 387 to 388 (stating that, "[a]s an inchoate crime, conspiracy fixes the point of legal intervention at agreement to commit a crime, or at agreement coupled with an overt act which may, however, be of very small significance," and "thus reaches further back into preparatory conduct than attempt, raising the question of whether this extension is desirable"); *id.*, comment 2(c)(i) to section 5.03, page 403 (stating that the requirement of intent—as in intent to kill unlawfully—"is crucial to the resolution of the difficult problems presented when a charge of conspiracy is levelled against a person whose relationship to a criminal plan is essentially peripheral").

murder *of the second degree*": "a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree" (*People* v. *Kynette, supra,* 15 Cal.2d at p. 745). Similarly, it is unnecessary to label the crime "conspiracy to commit murder *of the first degree*": there is no crime of "conspiracy to commit murder *of the second—or any other—degree*" from which it may be distinguished.

In *Horn,* however, this court—over my dissent—disapproved *Kynette* on these points. The *Horn* court recognized a "crime" of "conspiracy to commit murder of the second degree" in addition to one of "conspiracy to commit murder of the first degree."

In the course of its analysis, the *Horn* court proceeded to reject, on its own terms, *Kynette*'s holding that "a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree" because the "agreement to murder necessarily involves" both malice aforethought and a premeditated and deliberate intent to kill unlawfully. (*People* v. *Kynette, supra,* 15 Cal.2d at p. 745.)

One of the *Horn* court's reasons was, substantially, that an "agreement to murder" might not entail a premeditated and deliberate intent to kill unlawfully because the latter then "require[d] proof that the defendant 'could maturely and meaningfully reflect upon the gravity of his contemplated act.' " (*People* v. *Horn, supra,* 12 Cal.3d at p. 298.) In *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959], from which *Horn*'s quotation is taken, we had held that the "true test" of a premeditated and deliberate intent to kill unlawfully was such.

The other of the *Horn* court's reasons was to the effect that an "agreement to murder" might not entail a premeditated and deliberate intent to kill unlawfully or even malice aforethought because the threshold of proof therefor had been raised, in practice, by imposition on the prosecution of the burden to rebut any defense of diminished capacity. In *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], disapproved on another point in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 327, footnote, 7 [149 Cal.Rptr. 265, 583 P.2d 1308], and *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492], also disapproved on another point in *People* v. *Wetmore, supra,* 22 Cal.3d at pages 324, footnote 5, and 327, footnote 7, and their progeny, we had established that defense, which was available to negate all mental states other than so-called "general criminal intent" (see generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, §§ 208-209, pp. 237-240), including premeditated and deliberate intent to kill unlawfully (see, e.g., *People* v. *Wolff, supra,* 61 Cal.2d at pp. 818-822) and malice aforethought (see, e.g., *People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr.

815, 411 P.2d 911]). "[A] conviction of murder in any degree," says *Horn*, "requires proof of malice aforethought; since *People* v. *Gorshen* (1959) 51 Cal.2d 716, 727 [336 P.2d 492], malice can be rebutted 'by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication.'" (*People* v. *Horn*, *supra*, 12 Cal.3d at pp. 298-299, quoting *People* v. *Graham* (1969) 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153].) "Since evidence of diminished mental capacity can show that a homicide was committed without premeditation or malice aforethought, reducing that homicide to second degree murder or manslaughter, such evidence may also serve to classify a conspiracy to commit a homicide as one to commit second degree murder or manslaughter." (*People* v. *Horn*, *supra*, 12 Cal.3d at p. 295.)

In a footnote, the *Horn* court added: "*Kynette's* assertion that a conspiracy to commit murder is always a conspiracy to commit first degree murder is inconsistent with the present language of Penal Code section 182. When *Kynette* was decided, section 182 provided simply that conspirators to commit a felony 'shall be punishable in the same manner and to the same extent as provided for the punishment of the commission of the said felony.' The current section 182, enacted in 1955, is much more specific: 'If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.' [¶] As this language is written and punctuated, it plainly authorizes the trier of fact to return a verdict finding conspiracy to commit murder in the second degree. *Only* if the trier of fact fails to determine the degree is a conspiracy to commit murder punished as one to commit first degree murder. Since the Legislature has authorized a verdict of conspiracy to commit second degree murder, it clearly does not believe that crime to be a logical impossibility." (*People* v. *Horn*, *supra*, 12 Cal.3d at p. 298, fn. 5, italics in original.)

What are we to do with *Kynette* and *Horn*?

On its very face, *Kynette* is persuasive. Its words, which are quoted above, need merely be reread to prove the point.

The same cannot be said of *Horn*.

Judged within the legal framework set out above, *Horn* has been wanting from the day it was decided.

But let me not press the point. For argument's sake only, I shall assume that, when it was handed down, *Horn* was good law. It is no longer.

To the extent that the *Horn* court believed that an "agreement to murder" might not entail a premeditated and deliberate intent to kill unlawfully because the latter then "require[d] proof that the defendant 'could maturely and meaningfully reflect upon the gravity of his contemplated act . . .'" (*People* v. *Horn, supra,* 12 Cal.3d at p. 298), it has been passed by. It is true that, prior to *Horn,* we had held in *People* v. *Wolff, supra,* 61 Cal.2d at page 821, that the "true test" of a premeditated and deliberate intent to kill unlawfully was such. But it is also true that, after *Horn,* the Legislature overruled us on that very point. Specifically, it amended Penal Code section 189 through the addition of the following sentence (Stats. 1981, ch. 404, § 7, p. 1593), which remains in the provision today: "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove that the defendant maturely and meaningfully reflected upon the gravity of his or her act."

Furthermore, to the extent that the *Horn* court believed that an "agreement to murder" might not entail a premeditated and deliberate intent to kill unlawfully or even malice aforethought because the threshold of proof therefor had been raised, in practice, by imposition on the prosecution of the burden to rebut any defense of diminished capacity, it has been passed by on this matter as well. At the same time that it amended Penal Code section 189 as indicated above, the Legislature added section 28, subdivision (b), to the same code (Stats. 1981, ch. 404, § 4, p. 1592), which expressly abolished the defense: "As a matter of public policy there shall be no defense of diminished capacity . . . ." A year later, the people added section 25, subdivision (a), to the code (Prop. 8, Primary Elec. (June 8, 1982) § 4), which abolished the defense even more expressly: "The defense of diminished capacity is hereby abolished. . . ."

What remains of *Horn* is its footnote quoting Penal Code section 182, which in pertinent part is virtually the same now as then: "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree." (*Id.,* subd. (a).)

When we construe Penal Code 182, as we must, in its full context (see *Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 673 [47 Cal.Rptr.2d

108, 905 P.2d 1248] (conc. opn. of Mosk, J.)), we find therein the Legislature's acquiescence in *Kynette*—express as to the punishment prescribed for the crime of conspiracy to commit murder, implied as to the crime itself. We read the provision to contain the words in italics: "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit, *except in the case of murder*. If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree."

Were we to construe Penal Code section 182 otherwise, we would bring difficulties on ourselves—difficulties that we could and should avoid. As a doctrinal matter, we would be compelled to deviate from the general rule—stated in Penal Code section 182 itself and also in Penal Code sections 1157 and 1192—that gives the benefit of the trier of fact's nondetermination of the degree of a felony to the defendant. Moreover, as an historical matter, we would be forced to embrace two dubious conclusions. One would be that the Legislature impliedly acknowledged that the "crime" of "conspiracy to commit murder of the second degree" existed about 15 years after we had all but expressly declared in *Kynette* that it did not. The other would be that the Legislature intended to expose to the death penalty any person convicted of the "crime" of "conspiracy to commit murder of the second degree" who had had the misfortune to be tried by a jury or court that was unable to determine the degree of the "conspired" murder, or that did in fact determine the degree to be the second but failed to so specify. That is because, pursuant to Penal Code section 190 as it then stood (Stats. 1927, ch. 889, § 1, p. 1952), the punishment for the crime of murder of the first degree included death.[5]

Therefore, to the question, "What are we to do with *Kynette* and *Horn*?," my answer is, "We should overrule *Horn* and approve *Kynette*." Of course, we need not do so as a formal matter. *Kynette* approves itself. As stated, it is persuasive on its very face. In addition, *Horn* has been overruled for all practical purposes through the legislative abrogation of its premises. It is now a citation without substance. It falls of its own weight.

### III. *The Present Proceeding*

Let us now turn to the present proceeding.

---

[5]By contrast, it would not be difficult to conclude that the Legislature, having acquiesced in *Kynette,* intended to expose to the death penalty any person convicted of the crime of conspiracy to commit murder. Under *Kynette,* "a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree . . . ." (*People* v. *Kynette, supra,* 15 Cal.2d at p. 745.)

The Grand Jury of the City and County of San Francisco handed up to the superior court an indictment against Jamal K. Swain and David Chatman. In count 1, it charged both Swain and Chatman with the crime of murder; it alleged, inter alia, that the offense was "wilful, deliberate, and premeditated," and also, for enhancement of sentence, that both men were armed with (Pen. Code, § 12022, subd. (a)(1)), and personally used (*id.*, § 12022.5, subd. (a)), a firearm in its commission. In count 2, it charged both Swain and Chatman with the crime of conspiracy to commit murder. In count 3, it charged Swain alone with the crime of the felonious intimidation of a witness. (*Id.*, § 136.1, subd. (c)(1).) In count 4, it charged Swain alone with the same crime as to another witness. Swain and Chatman each pleaded not guilty to the charges and denied the allegations. On Swain's motion, the superior court severed count four for a separate trial. It subsequently ordered dismissal thereof. Apparently, it also ordered dismissal of the arming allegations.

Trial on counts 1, 2, and 3 was by jury. As to count 1, the jury found Swain not guilty of the crime of murder and not guilty of the lesser included offenses of voluntary and involuntary manslaughter; by contrast, it found Chatman guilty of the crime of murder of the second degree, and found true the allegation of personal use of a firearm. As to count 2, it found Swain guilty of the "crime" of "conspiracy to commit murder of the second degree"; it made the same finding as to Chatman. As to count 3, it found Swain guilty of the crime of the felonious intimidation of a witness.

The superior court rendered separate judgments against Swain and Chatman. It imposed on Swain a term of imprisonment for 15 years to life for the "crime" of "conspiracy to commit murder of the second degree"; it also imposed 3 years for the crime of the felonious intimidation of a witness, to be served consecutively; finally, it imposed a restitutionary fine in the amount of $200 (Gov. Code, § 13967). It imposed on Chatman a term of imprisonment for 15 years to life for the crime of murder of the second degree with 4 additional years for personal use of a firearm in its commission; it also imposed 15 years to life for the "crime" of "conspiracy to commit murder of the second degree," but stayed execution thereof (Pen. Code, § 654); finally, it imposed a restitutionary fine in the amount of $200.

The Court of Appeal, First Appellate District, Division Five, affirmed the judgments against Swain and Chatman in their entirety.

On separate petitions by the People, Swain, and Chatman, we granted review. As will appear, the judgment of the Court of Appeal must be reversed to the extent that it affirms the superior court's judgments against

Swain and Chatman convicting them of, and sentencing them for, the "crime" of "conspiracy to commit murder of the second degree."

The first question, which is general, is whether there is a crime of conspiracy to commit murder *simpliciter* or instead a "crime" of "conspiracy to commit murder *of the first degree*" and/or a "crime" of "conspiracy to commit murder *of the second degree*." For the reasons stated above, the answer is that only the former offense exists.

The second question, which is also general, is whether the crime of conspiracy to commit murder requires an intent to kill unlawfully. For the reasons stated above, the answer is that it does.

The third question, which is general as well, is what is the punishment for the crime of conspiracy to commit murder. For the reasons stated above, the answer is that it is the punishment for the crime of murder of the first degree—which, pursuant to Penal Code section 190, subdivision (a), is now imprisonment for a term of 25 years to life.[6]

The fourth question, which is specific to this cause, is whether the judgments convicting Swain and Chatman of, and sentencing them for, the "crime" of "conspiracy to commit murder of the second degree" must be reversed. The answer is that reversal is indeed required. Because each judgment involves a "crime" that does not exist, it is unsupported as a matter of law and hence cannot stand. (See *In re James M.* (1973) 9 Cal.3d 517, 519-522 [108 Cal.Rptr. 89, 510 P.2d 33].) In a given case, it may be possible to determine that a judgment effectively convicts a defendant of, and sentences him for, the crime of conspiracy to commit murder *simpliciter*, albeit under the label of "conspiracy to commit murder of the second degree." In a case of that sort, the judgment may be affirmed because the label may be disregarded. This is not such a case. It appears that we could determine that the judgments against Swain and Chatman effectively convicted them of, and sentenced them for, the crime of conspiracy to commit murder only if we could conclude that such judgments rested on an at least implied finding by the jury that intent to kill unlawfully was present. On my review of the record, we cannot so conclude.

The fifth question, which is also specific to this cause, is whether either Swain or Chatman or both may be retried for the crime of conspiracy to

---

[6]Pursuant to Penal Code section 190, subdivision (a), the punishment for the crime of murder of the first degree now includes death and imprisonment for life without the possibility of parole—but only for the actual commission of a murder of such degree *and* only under certain special circumstances as defined in Penal Code section 190.2, which authorizes both of the indicated penalties, and Penal Code section 190.25, which authorizes only the lesser.

commit murder without offense to the double jeopardy clause of the Fifth Amendment to the United States Constitution as made applicable to the states through the due process clause of the Fourteenth Amendment. The answer is that both men may in fact be retried. To be sure, the Fifth Amendment's double jeopardy clause "protects against a second prosecution for the same offense" both "after acquittal" and "after conviction." (*North Carolina* v. *Pearce* (1969) 395 U.S. 711, 717 [23 L.Ed.2d 656, 664-665, 89 S.Ct. 2072].) But neither man was expressly *convicted* of the crime of conspiracy to commit murder *simpliciter*; neither was expressly *acquitted* thereof. Furthermore, as explained in the preceding paragraph, we cannot conclude that either man was impliedly *convicted* of the crime under the label of "conspiracy to commit murder of the second degree"; neither, I believe, can we conclude that either was impliedly *acquitted* thereunder.

The sixth and final question, which is specific to this cause as well, is what is the punishment that may be imposed on Swain or Chatman in the event that he is convicted of the crime of conspiracy to commit murder on retrial. The answer is that it is the punishment for the "crime" of "conspiracy to commit murder of the second degree"—which, pursuant to *Horn*, is imprisonment for a term of 15 years to life. That is because a retroactive application of the law as herein declared would "make[] more burdensome the punishment for a crime, after its commission" (*Beazell* v. *Ohio* (1925) 269 U.S. 167, 169 [70 L.Ed. 216, 217, 46 S.Ct. 68]; accord, *Collins* v. *Youngblood* (1990) 497 U.S. 37, 42 [111 L.Ed.2d 30, 38-39, 110 S.Ct. 2715]), and would thereby violate the due process clause of the Fourteenth Amendment (see *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 352-354 [12 L.Ed.2d 894, 899-900, 84 S.Ct. 1697]; see also *In re Baert* (1988) 205 Cal.App.3d 514, 518 [252 Cal.Rptr. 418] (per Arabian, J.)).[7]

## IV. *Conclusion*

For the foregoing reasons, I join the majority in concluding that the judgment of the Court of Appeal should be reversed to the extent that it affirms the superior court's judgments against Swain and Chatman convicting them of, and sentencing them for, the "crime" of "conspiracy to commit murder of the second degree."

Arabian, J., concurred.

---

[7]It would not violate the due process clause of the Fourteenth Amendment to impose imprisonment for a term of 25 years to life as the punishment for the crime of conspiracy to commit murder on a defendant who commits the offense *on or after the date that our decision herein becomes final*. He will have been given "fair warning" (*Bouie* v. *City of Columbia*, *supra*, 378 U.S. at p. 352 [12 L.Ed.2d at p. 899]) in the matter of the penal sanction by the expression of what appears to be our unanimous view that *Horn*'s premises have been legislatively abrogated, and hence will not be heard to complain of any "unforeseeable and retroactive judicial expansion" in this area (*ibid.*).

**KENNARD, J.**—I concur in the majority's holding, set forth in parts I and II of the majority opinion, that an unlawful intent to kill (what our law terms "express malice") is an element of conspiracy to commit murder. The majority, however, does not reach the issue of whether conspiracy to commit murder is divided into degrees with differing punishments. Left unanswered, therefore, is this question: Is there conspiracy to commit first degree murder and conspiracy to commit second degree express-malice murder, or only conspiracy to commit murder? Unlike the majority, I would decide this issue, as it is likely to arise on remand and is of widespread significance to the law governing murder conspiracies, thus necessitating guidance to the bench and bar.

In deciding it, I would adhere to this court's view in *People* v. *Horn* (1974) 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300] that conspiracy to commit first degree murder and conspiracy to commit second degree murder are separate crimes distinguished by whether the intent to kill reflected in the conspirators' agreement is deliberate and premeditated or not. I would further conclude that under the Penal Code, each type of conspiracy to murder is subject to the punishment prescribed for the corresponding degree of murder.

I

As relevant here, defendants David Chatman and Jamal K. Swain were charged with murder and with conspiracy to commit murder. The trial court instructed the jury that murder required malice, that malice could be express or implied, and that conspiracy to commit murder required the specific intent to commit first or second degree murder. The instructions thus permitted the jury to find defendants guilty of conspiracy to commit second degree murder on an implied malice theory, that is, without finding they had the intent to kill. The jury convicted Chatman of second degree murder and conspiracy to commit second degree murder; it convicted Swain of conspiracy to commit second degree murder but acquitted him of murder. On the conspiracy conviction, the trial court sentenced each defendant to prison for 15 years to life, the punishment for second degree murder. Defendants appealed, contending that conspiracy to murder requires intent to kill as one of its elements; the People also appealed, contending that all conspiracies to murder were subject to a prison sentence of 25 years to life, the punishment for first degree murder. The Court of Appeal affirmed the judgments in their entirety.

II

I agree with the majority that conspiracy to murder requires proof of an unlawful intent to kill. I would, however, also decide the further question of

whether there are separate crimes of conspiracy to commit first degree murder and of conspiracy to commit second degree express-malice murder, or whether conspiracy to commit murder is a unitary crime requiring only intent to kill. As I noted at the outset, the issue is a significant one affecting the jury instructions to be given in every murder conspiracy case and will inevitably arise if defendants are retried. As Justice Mosk notes in his concurring opinion, this court has in the past addressed issues likely to arise on remand of a case, and should do so here as well.

Penal Code section 182 (hereafter section 182) makes it unlawful for "(a) . . . two or more persons [to] conspire: [¶] (1) [t]o commit any crime" and establishes the punishment for conspiracies, including murder conspiracies. For crimes divided according to degree, section 182 provides for the following punishment: "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree." I shall refer to this as the punishment language of section 182.

The crime of murder is divided into degrees. At the time the murder at issue in this case occurred, Penal Code section 189 defined first degree murder as (1) "any . . . kind of willful, deliberate, and premeditated killing" (including killings accomplished by any of a variety of statutorily designated methods, the use of which in effect establishes deliberation and premeditation as a matter of law) or (2) murders "committed in the perpetration of, or attempt to perpetrate," certain designated felonies (commonly referred to as felony murder). "All other kinds of murders are of the second degree." (Pen. Code, § 189.) First and second degree murder have different punishments. (Pen. Code, § 190.) Because murder is a crime "for which different punishments are prescribed for different degrees" (§ 182), the punishment language of section 182 on its face divides murder conspiracies into degrees, just as it does other crimes for which different punishments are prescribed for different degrees.

To understand the debate over whether the current version of section 182 divides conspiracy to murder into degrees, however, it is necessary to begin with *People* v. *Kynette* (1940) 15 Cal.2d 731 [104 P.2d 794] (hereafter *Kynette*), which was decided when a different version of section 182 was in effect. At that time, section 182 provided that a conspiracy was "punishable in the same manner and to the same extent as in this code provided for the

punishment of the commission of the said felony." (Former § 182, as amended by Stats. 1919, ch. 125, § 1, p. 170; *Kynette, supra,* 15 Cal.2d at p. 744.) The defendant in *Kynette* argued that the trial court improperly excluded jurors with reservations against the death penalty because, he contended, the death penalty (a possible penalty for first degree murder) was not a possible punishment for conspiracy to commit murder. (*Id.* at p. 744.) Thus, the issue was whether the penalty for first degree murder was a possible penalty for a conspiracy to commit murder.

In *Kynette,* this court held that the death penalty was a possible punishment for conspiracy to commit murder. (*Kynette, supra,* 15 Cal.2d at p. 745.) It reasoned that all conspiracies to commit murder were necessarily conspiracies to commit first degree murder. (*Ibid.*)

In 1955, 15 years after *Kynette, supra,* 15 Cal.2d 731, the Legislature changed the punishment language of section 182 to provide as follows: "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree." (§ 182, as amended by Stats. 1955, ch. 660, § 1, p. 1155.) The punishment language of section 182 remains substantially the same today.

Almost 20 years after the Legislature altered section 182, this court addressed the effect of those changes on conspiracy to commit murder in *People* v. *Horn, supra,* 12 Cal.3d 290 (hereafter *Horn*). In that case, the court concluded that conspiracies to kill could take the form of conspiracies to commit first degree murder, conspiracies to commit second degree murder, and conspiracies to commit manslaughter. (*Id.* at pp. 298-300 & fn. 5.) In doing so, the court relied on three reasons: the existence of the diminished capacity defense; the then-existing requirement that for premeditation to exist the defendant must have "maturely and meaningfully reflect[ed] [on] the gravity of his contemplated act" (*People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959], italics omitted); and the post-*Kynette* changes to the punishment for murder conspiracies set forth in section 182. (*Horn, supra,* 12 Cal.3d at pp. 298-300 & fn. 5.) The court disapproved *Kynette* to the extent it was inconsistent. (*Horn, supra,* 12 Cal.3d at p. 301, fn. 8.)

As the majority notes, the first two reasons set forth in the *Horn* decision (*supra,* 12 Cal.3d 290) supporting the division of murder conspiracies into

degrees—the existence of the diminished capacity defense and the "mature and meaningful reflection requirement"—are no longer the law. (Maj. opn., *ante*, at p. 608.) There remains, however, the punishment language of section 182.

The natural reading of the punishment language of section 182 makes conspiracies to murder punishable by degree, just as conspiracies to commit other crimes are punishable by degree. The first sentence of the punishment language of section 182 ("If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit.") requires the trier of fact to ascertain the degree of the crime that is the object of the conspiracy, and thereby impliedly makes the punishment for the conspiracy the punishment for that degree of the crime. The second sentence of the punishment language of section 182 ("If the degree is not so determined, the punishment for conspiracy to commit the felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.") states that when the degree is not determined, the punishment is to be for the lesser degree *except* in the case of murder, which is punished in the first degree. By its terms, the murder conspiracy exception just referred to is limited to cases in which the jury has not determined the degree; it is not an exception removing murder conspiracies entirely from classification and punishment by degree. Thus, *Horn* correctly concluded that, "[a]s this language is written and punctuated, it plainly authorizes the trier of fact to return a verdict finding conspiracy to commit murder in the second degree." (*Horn, supra,* 12 Cal.3d at p. 298, fn. 5.) Nor is there any evidence of a contrary legislative intent underlying the enactment of section 182.

When this analysis of section 182 is coupled with our holding today that conspiracy to murder requires an unlawful intent to kill, the result is that a conspiracy to murder may be either a conspiracy to commit first degree murder or a conspiracy to commit second degree express-malice murder. The degree of the murder conspiracy depends on whether the conspirators' agreement evidences a willful, deliberate, premeditated intent to kill of the type that distinguishes first degree murder or instead reflects only a bare intent to kill lacking in premeditation and deliberation.[1] Reading section 182 as dividing conspiracy to murder into degrees, the punishment for each

[1]For purposes of this discussion, I include within the term "willful, deliberate and premeditated" the methods of killing designated in Penal Code section 189 that serve to elevate a killing to first degree murder. At the time of this case, those methods were killing "by means of a destructive device or explosive, knowing use of ammunition designed primarily to

degree of conspiracy to commit murder is that for the underlying degree of murder. If the trier of fact fails to determine the degree, the conspiracy is subject to the punishment for first degree murder.

The reason for this structure of conspiracy to murder is readily apparent. If conspiracy to murder were a unitary crime that required only intent to kill, which is the mental state of second degree murder, but was punished as first degree murder, then conspiracies that involve agreements to commit only the elements of second degree murder (e.g., that lack premeditation and deliberation) would be punished more severely than the completed crime of second degree murder.

There is an additional reason for adhering to *Horn*'s conclusion that conspiracy to commit murder is divided by degrees. *Horn* has been the law for 21 years. During that time, the Legislature has not amended section 182 to change the understanding of murder conspiracy set forth in *Horn*. Therefore, the prudent and preferable course is to retain *Horn*'s structure of conspiracy to murder as a crime divided into degrees with different punishments for each degree. If the Legislature wishes to alter this structure of conspiracy to murder, it can do so. That significant policy decision, however, should be left to the Legislature.

Finally, I note that as a factual matter the crime of conspiracy to commit second degree express-malice murder applies only to a narrow range of cases—those in which conspirators formed an agreement to kill but made that agreement without deliberation and premeditation. It seems doubtful that any agreement persisting beyond more than the briefest duration would lack deliberation and premeditation, for inevitably the passage of time alone would cause the agreement to become deliberate and premeditated.

## III

Justice Mosk, however, comes to a different conclusion than I have reached. He concludes that conspiracy to murder is a unitary crime that requires only intent to kill but is subject to the punishment for first degree murder. He therefore rejects this court's view (*Horn, supra*, 12 Cal.3d 290)

---

penetrate metal or armor, poison, lying in wait, [or] torture." (*Ibid.*) Moreover, as a practical matter, a conspiracy to kill by one of these methods almost inevitably will involve deliberation and premeditation. Because it is not at issue in this case, I do not address whether conspiracy to commit first degree murder is a possible crime in cases in which the first degree murder theory would be felony murder, rather than deliberation and premeditation. Presumably, if it is possible for a defendant to be convicted of conspiracy to commit first degree murder on a felony-murder theory, under today's holding the prosecution would have to prove intent to kill, even though it is not an element of first degree felony murder.

that the punishment language of section 182 recognizes the crime of conspiracy to commit second degree murder.

Although Justice Mosk relies on *Kynette, supra*, 15 Cal.2d 731, in reaching this conclusion, in my view *Kynette* does not really support his position. As the majority notes, proof of conspiracy requires proof that the conspirators intended to commit the elements of the offense that is the object of the conspiracy. (Maj. opn., *ante*, at p. 600.) In *Kynette*, this court stated that "a conspiracy to commit murder can only be a conspiracy to commit murder of the first degree for the obvious reason that the agreement to murder necessarily involves the 'willful, deliberate and premeditated' intention to kill a human being." (*Kynette, supra*, 15 Cal.2d at p. 745.) *Kynette* thus expresses the view that conspiracy to commit murder, as an agreement to commit the elements of first degree murder, requires proof that the conspirators' intent to kill was deliberate and premeditated, but assumes that the agreement to murder itself will provide proof of deliberation and premeditation.

According to Justice Mosk, however, conspiracy to murder requires no mental state other than intent to kill. He states that "[t]he offense does not require, as a factual matter, a *premeditated and deliberate* intent to kill." (Conc. opn. of Mosk, J., *ante*, at p. 613, italics in original.) In effect, Justice Mosk treats all conspiracies to commit murder as conspiracies to commit *second* degree express-malice murder—that is, the only mental state required, or relevant, to conspiracy to commit murder, in addition to intent to agree, is intent to kill, which is the mental state of second degree express-malice murder.[2]

For this reason, under Justice Mosk's approach, every murder conspiracy would be punished as first degree murder even though the jury would have found only the mental state of second degree murder—intent to kill. Thus, conspiracy agreements to commit only the elements of second degree express-malice murder (e.g., agreements that lack premeditation and deliberation) and conspiracy agreements that reflect the premeditation and deliberation that distinguishes first degree murder would both be subject to the punishment established for first degree murder. As I have noted, this would produce the unjust and illogical result that second degree express-malice murder conspiracies would be punished more severely than the completed crime of second degree murder.

Furthermore, Justice Mosk's position is contrary to the ordinary meaning of section 182. In justification, he suggests that to follow section 182's plain

---

[2]In his dissent in *Horn, supra*, 12 Cal.3d 290, 304, however, Justice Mosk did recognize conspiracy to commit second degree murder as a separate crime in "those instances when the planned method of killing falls within the Penal Code section 189 definition of murder in the second degree." (*Ibid.* (dis. opn. of Mosk, J.).)

language, under which murder conspiracies are subject to the punishment for first degree murder if the trier of fact fails to determine the degree of the murder that is the conspiracy's object, would violate the general rule that when the trier of fact fails to determine the degree of the felony that is the object of a conspiracy, or the degree of a substantive felony, the defendant is only subject to the punishment prescribed for the lesser degree. (See Pen. Code, §§ 182, 1157, 1192.) There is, however, a logical reason why, when the trier of fact fails to determine the degree of the crime, murder conspiracies are punished in the first degree while conspiracies to commit all other crimes are punished in the lesser degree. Deliberate and premeditated murders are murders of the first degree. As *Kynette* recognized, in the typical murder conspiracy the conspirators will act with premeditation and deliberation in forming an agreement to commit the crime. (*Kynette, supra,* 15 Cal.2d at p. 745.) Punishing murder conspiracies of unspecified degree as first degree murder conspiracies simply accords with the statistical reality that the vast majority of murder conspiracies will involve premeditation and deliberation.

The deliberate and premeditated nature of most conspiracies, however, does not similarly increase the likelihood that conspiracies to commit crimes other than murder will be first degree conspiracies. Unlike murder, other crimes of degree do not become first degree by being premeditated and deliberate; as to those crimes, the degree of the crime typically turns on the nature of the defendant's acts rather than the defendant's mental state. For example, the degree of a robbery can vary depending on the location where the robbery occurs. (Pen. Code, § 212.5.) Thus, the fact that conspiracies to commit crimes other than murder may also reflect a premeditated and deliberate intent to commit the underlying crime does not support a similar "presumption" that the crime, if committed, would be in the first degree.

Justice Mosk also asserts that following the plain meaning of section 182 and recognizing the existence of both first and second degree murder conspiracies would mean that the Legislature, in enacting section 182 in 1955, intended to subject to the possibility of the death penalty anyone convicted of conspiracy to murder merely because the jury failed to specify the degree of the crime. His reading of section 182, however, under which all conspiracies to commit murder are punished the same as first degree murders and his view that conspiracy to commit murder is a unitary crime requiring only intent to kill leads to an even more extreme result, namely, that the Legislature intended to subject *all* murder conspirators to the death penalty even if they lacked the intent to commit the elements of first degree murder (e.g., premeditation and deliberation).

Finally, Justice Mosk notes that reading section 182 as dividing conspiracy to murder into degrees would mean that the Legislature implicitly

rejected *Kynette, supra*, 15 Cal.2d 731, in adopting section 182. In my view, however, there is nothing so unreasonable about this conclusion that would justify this court, in order to avoid it, to depart from the ordinary meaning of the language used in that statute.

In my view, the post-*Kynette, supra*, 15 Cal.2d 731, punishment language of section 182, the decision in *Horn, supra*, 12 Cal.3d 290, and the Legislature's acceptance of *Horn* foreclose the result that Justice Mosk proposes. Instead, I would continue to adhere to *Horn*'s recognition that, under section 182, conspiracy to commit first degree murder (subject to the punishment prescribed for first degree murder) and conspiracy to commit second degree murder (subject to the punishment prescribed for second degree murder) are both possible crimes.

## IV

I now turn to the question of the degree or degrees of conspiracy to murder for which these defendants may be retried, and what punishment they may receive if convicted. The scope of retrial and resentencing turns on the effect, if any, of two constitutional limitations: the prohibition against double jeopardy (*Montana* v. *Hall* (1987) 481 U.S. 400, 402 [95 L.Ed.2d 354, 358-359, 107 S.Ct. 1825]; *People* v. *Santamaria* (1994) 8 Cal.4th 903, 910-911 [35 Cal.Rptr.2d 624, 884 P.2d 81]) and the due process bar against retroactive increases in punishment (see *People* v. *Escobar* (1992) 3 Cal.4th 740, 752 [12 Cal.Rptr.2d 586, 837 P.2d 1100]; *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 352-354 [12 L.Ed.2d 894, 899-900, 84 S.Ct. 1697]).

In convicting defendants of conspiracy, the jury completed two verdict forms with respect to each defendant. First, it completed a form entitled "VERDICT" and reading, "We, the jury in the above-entitled cause, find the defendant [name] _____ of the crime of felony, to wit: violation of Section 182.1 of the California Penal Code (Conspiracy)" by filling in the blank with the word "Guilty." Second, it completed a form entitled "FINDING ON OBJECT OF CONSPIRACY" and reading, "We, the jury in the above-entitled cause, having found the defendant, [name] GUILTY of conspiracy, find that defendant conspired to commit the crimes opposite the designation of which there has been placed an 'X'." There then follows a list of five crimes: first degree murder, second degree murder, voluntary manslaughter, involuntary manslaughter, and auto theft. The jury put an "X" next to second degree murder. Swain was also found not guilty of murder, voluntary manslaughter, and involuntary manslaughter (but guilty of intimidating a witness); Chatman was also found guilty of second degree murder.

Defendant Swain, arguing that the only murder conspiracy crime existing now is conspiracy to commit first degree murder, contends that he cannot be retried because he was impliedly acquitted of conspiracy to commit first degree murder when the jury checked off only second degree murder as the object of the conspiracy. As I conclude that conspiracy to commit second degree express-malice murder is a possible crime, I reject this contention. Defendant Chatman, arguing that both first and second degree murder conspiracies are possible, apparently concedes that he can be retried for conspiracy to commit second degree murder but not conspiracy to commit first degree murder. The Attorney General, taking the position that the only crime at issue is conspiracy in the abstract, contends that the defendants were convicted of the only crime they were charged with ("conspiracy") and were acquitted of nothing. The Attorney General contends that if their convictions are reversed, there are no limits on the crimes defendants can be charged with on retrial.

The Attorney General's position lacks merit. It would for example, permit retrial not only of the full range of murder conspiracies that exist under the law (whether that is ultimately determined to be first and second degree murder, first degree murder, or simply "murder") but also conspiracy to commit auto theft, one of the other options given to, but not chosen by, the jury that convicted defendants. Moreover, in *Horn, supra,* 12 Cal.3d at page 298, we rejected the view that conspiracy is a crime that exists in the abstract without reference to the crime that is the object of the conspiracy.

Rather, in accordance with my view that we should adhere to *Horn's, supra,* 12 Cal.3d 290, division of conspiracy to murder into conspiracy to commit first degree murder and conspiracy to commit second degree express-malice murder, these defendants may be retried for conspiracy to commit second degree murder, the crime for which these defendants were convicted. Doing so will not violate the double jeopardy clause, for these defendants were convicted, not acquitted, of conspiracy to commit second degree murder, the crime for which they would be retried. (*Montana v. Hall, supra,* 481 U.S. at p. 402 [95 L.Ed.2d at pp. 358-359]; *People v. Santamaria, supra,* 8 Cal.4th at pp. 910-911.) If they are again convicted, there is no legal obstacle to the trial court again sentencing defendants to the punishment for second degree murder that they received before, as there would be no retroactive increase in the punishment to which they were previously subject. The protection against double jeopardy does preclude retrying these defendants for conspiracy to commit first degree murder, a crime of which

they were impliedly acquitted. (See *People* v. *Superior Court (Marks)* (1991) 1 Cal.4th 56, 71, 74-76 [2 Cal.Rptr.2d 389, 820 P.2d 613]; *Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 511 & fn. 5 [183 Cal.Rptr. 647, 646 P.2d 809].)